**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TESHEMA LUCY, | : | CIVIL ACTION NO. |
|     Plaintiff, | : | 3:10-CV-1024 (JCH) |
| | : | |
| v. | : | |
| | : | |
| BAY AREA CREDIT SVC LLC, ET AL., | : | MAY 23, 2011 |
|     Defendants. | : | |

**RULING RE: DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION [Doc. No. 15]**

The plaintiff, Teshema Lucy, brings this action on her own behalf, and seeks to bring the action on behalf of all others similarly situated, against the defendants, Bay Area Credit Services LLC ("Bay Area Credit"), alleging multiple violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e(10), 1692f(1), as well as violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a.  See Am. Compl. (Doc. No. 8).  Bay Area Credit has moved to compel arbitration and to stay the present litigation (Doc. No. 15) pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq.  For the reasons that follow, the motion is denied.

**I.    RELEVANT FACTS**

On or about August 19, 2009, Lucy entered into a Wireless Service Agreement with AT&T.  Nellickunnel Aff. (Doc. No. 17) at ¶ 5.  The Wireless Services Agreement contains the following arbitration clause:

> (1) AT&T and you agree to arbitrate all disputes and claims between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not

limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;
- claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- claims that may arise after the termination of this Agreement.

References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us.

Nellickunnel Aff. (Doc. No. 17), Ex. A (hereafter "Wireless Service Agreement"), at 6 (emphasis added). Lucy subsequently incurred a debt to AT&T, her original creditor. Am. Compl. at ¶ 10; Answer (Doc. No. 9), at ¶ 10.

Approximately three weeks before Lucy and AT&T entered into the Wireless Services Agreement, Bay Area Credit and AT&T entered into a Collection Agency Services Agreement. Mem. in Opp. (Doc. No. 33) at 4, Ex 1 (hereafter "Collection Agreement"). Under the Collection Agreement, Bay Area Credit agreed to provide to AT&T and its affiliates, in exchange for specified compensation, services for the collection of delinquent accounts referred to Bay Area Credit by AT&T or its affiliates. Collection Agreement, §§ 3-4, 6. The Collection Agreement expires on June 30, 2012. Collection Agreement, § 2.

In the Collection Agreement, Bay Area Credit expressly "warrants to AT&T that . . . [Bay Area Credit] is an independent business and, except as specifically provided herein, will perform all obligations under this Agreement as an independent contractor and not as an agent or an employee of AT&T." Collection Agreement, § 16(1). Bay

Area Credit and AT&T contractually agreed that Bay Area Credit "has and retains the right to exercise full control of and supervision over the performance of the Services and full control over the employment, direction, assignment, compensation, and discharge of all personnel performing the Services." Collection Agreement, § 16(3). Bay Area Credit also contracted to "indemnify, hold harmless, and defend AT&T . . . against any Loss arising from or in connection with, or resulting from, the materials or Services furnished by [Bay Area Credit] or [Bay Area Credit's] acts or omissions with respect to this Agreement." Collection Agreement, § 19.

On March 2, 2010, Bay Area Credit sent Lucy a collection letter in which Bay Area Credit demanded payment of a "Contractual Collection Fee" of $219.18. Compl., Ex. A; Answer, at ¶ 15. Lucy alleges that the Contractual Collection Fee that Bay Area Credit sought to collect was not authorized by the Wireless Service Agreement between Lucy and AT&T. Compl. at ¶ 19. Bay Area Credit denies this allegation. Answer at ¶ 19.

## II.   LEGAL STANDARD

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." AT&T Mobility LLC v. Concepcion, 563 U.S. ___, 2011 WL 1561956, *5 (2011) (internal quotation marks and citations omitted). "[T]he FAA was enacted to replace judicial indisposition to

arbitration, and is an expression of a strong federal policy favoring arbitration as an alternative means of dispute resolution." Ross v. American Express Co., 547 F.3d 137, 142 (2d Cir. 2008) (internal quotation marks and citations omitted).

At the same time, arbitration "is a matter of consent, not coercion." Id. at 143 (quoting Volt Info. Scis. v. Bd. of Trs. Of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989)). Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Republic of Ecuador v. Chevron Corp., __ F.3d __, 2011 WL 908118, *4 (2d Cir. 2011); Vera v. Saks & Co., 335 F.3d 109, 116 (2d Cir. 2003). "Persons are generally entitled to have their dispute settled by the ruling of a court of law. It is essentially only by making a commitment to arbitrate that one gives up the right of access to a court of law in favor of arbitration." Sokol Holdings, Inc. v. BMB Munai, Inc., 542 F.3d 354, 358 (2d Cir. 2008) (citation omitted). "While the FAA expresses a strong federal policy in favor of arbitration, the purpose of Congress in enacting the FAA was to make arbitration agreements as enforceable as other contracts, but not more so." Cap Gemini Ernst & Young, U.S., LLC v. Nackel, 346 F.3d 360, 364 (2d Cir. 2003) (emphasis in original) (internal quotation marks and citation omitted). "[C]ourts must place arbitration on an equal footing with other contracts, and enforce them according to their terms." AT&T Mobility LLC, 2011 WL 1561956, at *5 (citations omitted).

In determining whether to compel arbitration pursuant to the FAA, a court looks to four factors: (1) whether the parties agreed to arbitrate their dispute; (2) whether the asserted claims fall within the scope of the arbitration agreement; (3) whether Congress intended the federal statutory claims asserted by the plaintiff, if any, to be non-

arbitrable, and (4) if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the remaining claims pending arbitration. See JLM Industries, Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004).

To answer the question of whether the parties agreed to arbitrate a certain matter, the court looks to the "ordinary state-law principles that govern the formation of contracts" under the law of the state governing the contract. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); see also Kurz v. Chase Manhattan Bank USA, N.A., 319 F. Supp. 2d 457, 461 (S.D.N.Y. 2004) ("Whether the parties agreed to arbitrate is determined by state contract law."). In the case at bar, the court applies Connecticut law, as Lucy is located in Connecticut, and the AT&T Service Agreement provides that the "law of the state of your billing address shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law." Doc. No. 17, Ex. A, at 7; see Volt, 489 U.S. at 477-79 (holding that FAA does not preempt choice-of-law provisions); Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 32 n.3 (2d Cir. 2001).

### III.   DISCUSSION

Bay Area Credit, the party seeking to compel arbitration, has "not entered into any contract what[so]ever with [plaintiff], let alone any contract containing an arbitration clause." Ross, 547 F.3d at 143. Instead, the question in this Motion is whether Bay Area Credit may invoke the arbitration clause contained within the Wireless Service Agreement signed by Lucy and AT&T.

The terms of the arbitration clause in the Wireless Service Agreement cover AT&T and its "subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns." Wireless Service Agreement, at 6. Bay Area Credit offers two arguments in support of its attempt to invoke the arbitration clause of the Wireless Service Agreement: (1) Bay Area Credit is an "agent" covered by the arbitration clause;[1] (2) even if Bay Area Credit is not an agent, it may compel arbitration under the doctrine of equitable estoppel. Mem. in Support of Mot. to Compel Arbitration ("Mem. in Supp.") (Doc. No. 16), at 11; Reply (Doc. No. 34), at 2.

A.  Bay Area Credit's Claim to be AT&T's Agent

Bay Area Credit argues that it "attempted to collect an account owed to AT&T by plaintiff as AT&T's collection agent." Mem. in Supp., at 11. Because the Wireless Service Agreement defines AT&T to include its "agents," Bay Area Credit contends that it "may seek the arbitration provided for in the Wireless Agreement." Id.

Bay Area Credit's position is untenable. In the Collection Agreement, Bay Area Credit expressly warrants to AT&T that it will perform "all obligations under this Agreement as an independent contractor and not as an agent or an employee of AT&T." Collection Agreement, § 16(1) (emphasis added). Indeed, Bay Area Credit and AT&T contractually agreed that Bay Area Credit "has and retains the right to exercise full control of and supervision over the performance of the Services and full control over the employment, direction, assignment, compensation, and discharge of all personnel performing the Services." Collection Agreement, § 16(3). Finally, Bay Area Credit

---

[1] Although the arbitration clause in the Wireless Service Agreement also defines AT&T to include AT&T's "assigns," Bay Area Credit has not asserted that it was an assignee of the debt from Lucy's account.

contracted to "indemnify, hold harmless, and defend AT&T . . . against any Loss arising from or in connection with, or resulting from, the materials or Services furnished by [Bay Area Credit] or [Bay Area Credit's] acts or omissions with respect to this Agreement." Collection Agreement, § 19.   The Collection Agreement was signed three weeks before Lucy entered into the Wireless Services Agreement with AT&T, and it does not expire until 2012.  Having provided this warranty to AT&T, Bay Area Credit now contends that it is covered by the arbitration clause in the Wireless Service Agreement as an "agent."

Because the law of the State of Connecticut applies to the Wireless Service Agreement, the court interprets the term "agent" according to Connecticut law.  Under Connecticut law, an agency relationship requires three elements: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." Gold v. Rowland, 296 Conn. 186, 208, n.16 (2010); see also Wesley v. Schaller Subaru, Inc., 277 Conn. 526, 543 (2006).  The Collection Agreement not only lacks "a manifestation by the principal that the agent will act for him," it contains an explicit disclaimer that Bay Area Credit will not act as AT&T's agent. Moreover, the understanding between the parties was that Bay Area Credit would be in control of the undertaking, as evidenced by the provision specifying that Bay Area Credit "has and retains the right to exercise full control of and supervision over the performance of the Services."  Collection Agreement, § 16(3).  This understanding precludes the court from finding that the third element of an agency relationship has been met.  Bearing in mind that "the labels used by the parties referring to their relationship are not determinative," Wesley, 277 Conn. at 543-44, the court concludes

that the operative terms of the Collection Agreement preclude an agency relationship between Bay Area credit and AT&T.

B.     Equitable Estoppel

Bay Area Credit maintains that even if it is not AT&T's agent, it may compel arbitration against Lucy "under the common law contract principle of equitable estoppel." Reply, at 2. Under the doctrine of equitable estoppel, "a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed . . . and the issues that had arisen among them discloses that the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Ragone v. Atlantic Video at the Manhattan Ctr., 595 F.3d 115, 126-27 (2010) (internal quotation marks and citation omitted). However, this does not mean:

> that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate. . . . [I]n addition to the intertwined factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.

Id. at 127 (quoting Sokol Holdings, Inc. v. BMB Munai, Inc., 542 F.3d 354, 359 (2d Cir. 2008)). For a non-signatory to an arbitration agreement to compel arbitration under the doctrine of equitable estoppel, "the relationships among the parties" must develop "in a manner that [makes] it unfair for [the party opposing arbitration] to claim that its agreement to arbitrate ran only" to the fellow signatory to the arbitration agreement, and not to the non-signatory seeking to compel arbitration. Sokol, 542 F.3d at 361.

Lucy asserts that Bay Area Credit's actions were not authorized under the Wireless Service Agreement. Am. Compl., at ¶ 19. Thus, the issues the non-signatory (Bay Area Credit) seeks to resolve in arbitration are intertwined with the the Wireless Service Agreement that Lucy signed. However, the relationship between Lucy and Bay Area Credit did not develop in a manner that would make it unfair for Lucy to claim its agreement to arbitrate ran only to AT&T. Although the Collection Agreement between AT&T and Bay Area Credit was executed three weeks before Lucy signed the Wireless Service Agreement, Bay Area Credit was not a party to the Wireless Service Agreement containing the arbitration clause. "[C]ontractually speaking, the plaintiff[] do[es] not know [Bay Area Credit] from Adam." Ross, 547 F.3d at 146.

In the arbitration clause of the Wireless Service Agreement, Lucy expressly permits specific classes of non-signatories to invoke arbitration pursuant to the Wireless Service Agreement. Specifically, the arbitration clause allows AT&T's "subsidiaries, affiliates, agents, employees, predecessors in interest, successor, and assigns" to compel arbitration. Wireless Service Agreement, at 6. Because the arbitration agreement delineates which non-signatories may compel arbitration, Lucy cannot fairly be considered to have consented to arbitration with any other entities. As established above, in Part III.A, Bay Area Credit was not AT&T's agent. Bay Area Credit does not purport to be a "subsidiar[y], affiliate[], . . . employee[], predecessor[] in interest, successor, [or] assign[ee]" of AT&T. Thus, the terms of the arbitration clause do not apply to Bay Area Credit.

Neither prevailing Second Circuit precedent, nor the cases cited by Bay Area Credit, compels a contrary result. The relationship between Lucy and Bay Area Credit

differs in material respects from prior cases in which equitable estoppel was applied to permit a non-signatory to compel arbitration. In JLM Industries, Inc. v. Stolt-Nielsen SA, 387 F.3d 163 (2d Cir. 2004), the parties seeking to compel arbitration were corporate parents of the signatory entities. Id. at 177. No such corporate relationship exists between Bay Area Credit and AT&T.

In Astra Oil Co., Inc. v. Rover Navigation, Ltd., 344 F.3d 276 (2d Cir. 2003), the non-signatory defendant seeking to compel arbitration was a close affiliate of a signatory entity, and the party opposing arbitration had been aware of the affiliation and had accepted instructions from the non-signatory and the signatory interchangeably. Id. at 277, 280. Here, Bay Area Credit is not an affiliate of AT&T, and there is no evidence suggesting that Lucy ever treated AT&T and Bay Area Credit as the same entity.

In Denney v. BDO Seidman LLP, 412 F.3d 58 (2d Cir. 2005), the plaintiffs alleged that a signatory party and a non-signatory party had acted in concert. Id. at 70. Having alleged concerted action, the plaintiffs were not permitted to "escape the consequences of those allegations by arguing" that the non-signatory defendant lacked "the requisite close relationship" to compel arbitration. Id. Here, Lucy's Amended Complaint does not allege that Bay Area Credit acted in concert with AT&T in violating the FDCPA or CUTPA.[2]

---

[2] Although not discussed by Bay Area Credit, the recent case of Ragone v. Atlantic Video at the Manhattan Ctr., 595 F.3d 115 (2d Cir. 2010) similarly turned on the signatory party's interchangeable treatment of a signatory and a non-signatory. In Ragone, the plaintiff had been hired by a signatory for the specific purpose of serving a non-signatory. Id. at 119. The plaintiff followed instructions from both the signatory defendant and the non-signatory defendant, understanding the non-signatory defendant to be, "to a considerable extent, her co-employer." Id. at 127. Under this set of facts, the Second Circuit permitted the non-signatory to compel arbitration in an employment discrimination suit. By contrast, Lucy did not sign the Wireless Service Agreement with the understanding that her obligations to AT&T also ran to Bay Area Credit.

In Choctaw Generation Ltd. Partnership v. American Home Assurance Co., 271 F.3d 403 (2d Cir. 2001), the Second Circuit applied equitable estoppel "in a situation where a defendant, while a non-signatory to the construction contract containing an arbitration clause, was nevertheless explicitly named therein as having certain tasks to perform under that contract." Ross, 547 F.3d at 145 (citing Choctaw, 271 F.3d at 406). By contrast, Bay Area Credit is not named in Wireless Services Agreement. Debt collectors are not mentioned in the arbitration clause of the Wireless Service Agreement, and the only time debt collection is referenced in the Wireless Service Agreement is in a separate section entitled "Dishonored Checks and Other Instruments." Wireless Service Agreement, at 4. Choctaw is additionally distinguishable in that the dispute between the plaintiff and the non-signatory defendant arose in the context of the non-signatory defendant's role as guarantor of the signatory defendant's performance. Choctaw, 271 F.3d at 405. Bay Area Credit is not a guarantor of AT&T's performance.

Finally, Bay Area Credit cites Fedotov v. Peter T. Roach & Assocs., P.C., No. 03 Civ. 8823(CSH), 2006 WL 692002 (S.D.N.Y. Mar. 16, 2006) for "the proposition that debt collectors are sufficiently related to the creditors . . . that estoppel should apply and arbitration should be required." However, the Fedotov court's holding contains no findings as to the relationship between the creditor and the debt collector, other than the statement that the debt collector was a "representative of" the creditor. Id. at *3. In this case, Bay Area Credit warranted to AT&T that it would not act as its agent. Collection Agreement, § 16(1). More importantly, Fedotov was decided before the Second Circuit clarified in Sokol that application of equitable estoppel requires that "in addition to the

intertwined factual issues, there must be a relationship among the parties . . . that justifies" the application of estoppel. Sokol, 542 F.3d at 359. Finally, in Fedotov, the plaintiff did not object to the defendant's motion to compel arbitration. Fedotov, 2006 WL 692002, at *1.

Lucy has fairly asserted that the arbitration clause in the Wireless Service Agreement runs only to AT&T and not to Bay Area Credit. Bay Area Credit was not a signatory to the Wireless Service Agreement. Bay Area Credit was not even among the class of non-signatory entities for which Lucy granted permission to invoke the arbitration clause. Moreover, Bay Area Credit does not have a corporate relationship with AT&T, and Bay Area Credit is not closely affiliated with AT&T. Lucy has not alleged that Bay Area Credit acted in concert with AT&T. Bay Area Credit is not named in the Wireless Service Agreement as having specific duties under that Agreement. Finally, the court has not been presented with any evidence that Lucy treated Bay Area Credit and AT&T interchangeably.

In order to grant the Motion to Compel Arbitration and Stay Proceedings under the principle of equitable estoppel, some relationship must exist between Bay Area Credit and Lucy "sufficient to demonstrate that the plaintiff[] intended to arbitrate this dispute with" Bay Area Credit. Ross, 547 F.3d at 146. No such relationship exists.

## IV. CONCLUSION

For the foregoing reasons, Bay Area Credit's Motion to Compel Arbitration and to Stay Proceedings **[Doc. No. 15]** is **DENIED.**

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 23rd day of May, 2011.

      /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge